IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,209

STATE OF KANSAS,
*Appellant*,

v.

SERGIO ANGEL ARRIZABALAGA,
*Appellee*.

SYLLABUS BY THE COURT

1.

A routine traffic stop must be supported from its inception by reasonable suspicion of criminal activity.

2.

The scope of the ensuing traffic investigation is limited to the tasks required to complete the purpose or mission of the stop. The tolerable duration of the investigation is the time reasonably necessary to carry out those tasks.

3.

Upon completion of the traffic citation process, the motorist must be allowed to proceed on without further delay unless the stopping officer has objectively reasonable suspicion of additional criminal activity.

4.

A routine traffic stop may also be extended if the continued detention of the vehicle occupants is consensual. Such encounters are generally not considered seizures within the Fourth Amendment.

5.

When a search and seizure is challenged by a motion to suppress, the State has the burden to prove the lawfulness of the search and seizure.

6.

A reviewing court first determines if the district court's factual findings are supported by substantial competent evidence. The district court's legal conclusions are then subjected to unlimited review. If the material facts are not disputed, the suppression question is solely a matter of law.

7.

In determining whether a roadside detention is too long to be justified as an investigative stop, a reviewing court will examine whether law enforcement diligently pursued means of investigation that were likely to confirm or dispel their suspicions quickly.

8.

The acceptable duration of any traffic stop is determined by the totality of the circumstances. There is no specific length or passage of time that renders a traffic stop unlawful.

Review of the judgment of the Court of Appeals in 57 Kan. App. 2d 79, 447 P.3d 391 (2019). Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed April 30, 2021. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and remanded.

*Amy E. Norton,* assistant county attorney, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellant.

*Julie McKenna*, of McKenna Law Office, P.A., of Salina, argued and the cause and was on the briefs for appellee.

The opinion of the court was delivered by

WARD, J.: The State of Kansas brings this interlocutory appeal from an order of the Saline County District Court suppressing the fruits (111.5 pounds of marijuana) of a vehicle search conducted by the Kansas Highway Patrol (KHP) on Interstate 70 near Salina, Kansas. The search was based on the alert of a drug dog called to the scene following the officer's processing of an observed traffic offense. The district court denied an initial suppression motion challenging reasonable suspicion but granted a second suppression motion finding that the duration of the continued detention of the driver to await the drug dog was excessive and unlawful. A Kansas Court of Appeals panel affirmed with one judge dissenting. We find that the trooper acted diligently under the circumstances, and we conclude that the delay from the time the trooper called for the drug dog until it arrived and alerted for controlled substances was not an excessive and unlawful extension of the driver's detention.

HISTORY OF THE CASE

*The Traffic Stop*

On the evening of September 5, 2017, KHP trooper Kyle Seiler was parked in the median of Interstate 70 monitoring traffic. He was near milepost 257 outside of Salina, Kansas. At 9:34 p.m. he observed a van travelling east at a speed noticeably slower than other traffic. The trooper began following the vehicle and initiated a traffic stop at 9:37 p.m. after observing it following too closely behind a large truck. In response to Seiler's emergency lights the van decelerated significantly in the driving lane coming almost to a stop and then suddenly moved to the shoulder. Seiler commented to his dispatcher,

3

"Bizarre stop here." His patrol car dash camera recorded the stop of the van and subsequent activities associated with the stop.

Once the van pulled over, Seiler left his patrol car and approached the stopped vehicle. He shined his flashlight into the rear of the van and saw that it contained various (later determined to be four) cardboard boxes in the back as well as a large duffel bag. There was a suitcase in the center row behind the driver's seat. Once the driver's window was down, Seiler could smell the strong scent of an air freshener or deodorizer which he knew is often used to mask the odor of marijuana. He could not identify the source of the scent. He also observed a radar detector on the windshield which struck him as odd given that the van was driving slower than other traffic on the interstate.

The driver was identified as Sergio Arrizabalaga. He told Seiler that he and his passenger Ms. Lopez were going to St. Louis, Missouri, to see family and friends. Seiler had already run the van's license plate prior to the stop and learned it came from a car rental agency. The rental agreement produced by Arrizabalaga showed the van had been picked up earlier that day in Denver, Colorado, and was scheduled to be dropped off in Tallahassee, Florida, on September 9, 2017. Seiler was puzzled about the van's destination. He had earlier encountered several motorists from Florida who were heading west as Florida was "in the midst of Hurricane Irma at the time."

Arrizabalaga accompanied Seiler back to the patrol car where Seiler began writing a warning citation for the observed traffic offense. Arrizabalaga stated he was from Broomfield, Colorado, about 20 minutes away from the airport in Denver where he rented the van. He said he and his passenger had just stopped to eat at the IHOP restaurant near the last exit in Salina and were now looking for a Holiday Inn to spend the night. Again, Seiler was puzzled because he knew there was a Holiday Inn next to the IHOP where Arrizabalaga had just dined.

Having been told by Arrizabalaga that he and his passenger were heading to St. Louis, Missouri, and knowing that the rental agreement showed the van being dropped off in Florida, Seiler asked Arrizabalaga if he was in fact going to Florida. Arrizabalaga said he was not, and that the car rental agency "messed up" the rental agreement. He said they were not given the correct vehicle and the rental company compensated for its mistake by providing extra days on the agreement. He and his passenger were going to travel around for a couple of weeks and then fly back to Colorado.

When Seiler asked Arrizabalaga about the boxes in the back of the van, he said they contained supplies for a party for Ms. Lopez whose birthday was nine days later. According to Arrizabalaga the birthday party was a surprise, and Ms. Lopez was not aware of the contents of the boxes.

While still writing the warning ticket in his patrol car Seiler was advised by his dispatcher that Arrizabalaga had a prior arrest for felony marijuana production as well as a prior arrest related to a stolen vehicle. At 9:53 p.m. Seiler finished the warning ticket, printed it, and handed it to Arrizabalaga with a verbal caution. He asked Arrizabalaga if he had any questions and the two shook hands. Arrizabalaga inquired about the next town with a hotel and Seiler responded. As Arrizabalaga started to leave the patrol car Seiler asked Arrizabalaga if he would answer a few more questions. Arrizabalaga agreed.

Seiler asked whether Arrizabalaga had any marijuana, heroin, cocaine, methamphetamine, guns, knives, or money in the van. Arrizabalaga laughed and shook his head. Seiler then asked him if he had ever been arrested for marijuana. Arrizabalaga initially said no but clarified that he once received a citation for smoking marijuana. This was inconsistent with the information provided by the dispatcher.

Seiler then requested consent to search the van and Arrizabalaga gave his consent. Seiler and Arrizabalaga went to the van. After Seiler began speaking with the passenger

but before he started his physical search of the van, Arrizabalaga withdrew his consent to search. The time was 9:57 p.m.

By this time, and in fact earlier in the sequence of events, Seiler had formed what he believed was reasonable suspicion of drug-related criminal activity. But he did not foresee Arrizabalaga withdrawing consent to search. Had he known, he would have detained Arrizabalaga following his confusing travel plan answers. In any event, with consent withdrawn, Seiler advised Arrizabalaga he was detaining him based on reasonable suspicion of criminal activity and would call for a drug dog to sniff the exterior of the van. He told Arrizabalaga "if there wasn't a dog available, he would be on his way." Seiler took Arrizabalaga's keys and directed that he and his passenger wait in the van.

Seiler promptly radioed asking for the assistance of a K-9 (drug dog) handler from Salina or Saline County and was told none were currently on duty. Seiler asked his dispatcher to call and see if Officer Austin Baker, who was coming on duty shortly, could check in early and respond to his location. As he was speaking with the dispatcher he heard from a different K-9 handler, Lieutenant Scott Walker, who said he was on duty and would proceed toward Seiler's location.

Walker arrived on scene at 10:21 p.m. This was 24 minutes after Arrizabalaga withdrew consent to search the van and 22 minutes after Seiler called for a drug dog. The two officers had Arrizabalaga and his passenger get out of the van. The dog sniff began and then ended less than a minute later when the dog signaled the presence of drugs in the van. Officers searched the van and found a large quantity of marijuana, specifically 111.5 pounds in 1-pound packages. Arrizabalaga was taken into custody.

6

*First Motion to Suppress*

Arrizabalaga was charged in Saline County District Court with possession of marijuana with intent to distribute, possession of drug paraphernalia, and no drug tax stamp. The first motion to suppress filed on his behalf asserted that Seiler did not have a sufficient legal basis to stop Arrizabalaga's vehicle or to continue detaining him after the traffic citation was completed.

The district court disagreed, finding that Seiler had reasonable suspicion (an observed traffic violation) for the initial stop; that he "diligently pursued the mission of the traffic stop" as he questioned Arrizabalaga and prepared the warning citation; that Arrizabalaga's agreement to answer additional questions after the ticket was written constituted a voluntary encounter which continued until Arrizabalaga withdrew his consent to search the van; and that Arrizabalaga's continued detention after withdrawal of consent was based on "objectively reasonable suspicion of other activities to extend the detention for the dog sniff."

The district court based its finding of reasonable suspicion to extend the detention on the totality of the circumstances. The court noted Seiler's initial observations of the van's cargo, the odor of cologne or air freshener, the one-way rental from Colorado to Florida, Arrizabalaga's unusual and inconsistent statements regarding his travel plans, and his drug-related criminal history. The motion to suppress was denied.

*Second Motion to Suppress*

In a second motion to suppress filed a month or so later Arrizabalaga took a different approach, challenging both the grounds and duration of his continued detention after completion of the traffic citation. His second motion stated:

7

"[T]here wasn't additional reasonable suspicion. The officer had concluded the traffic stop and released the driver. Nothing additional had been learned from that point until the dog arrived 24 plus minutes later. The detention was excessive and violated Mr. Arrizabalaga's Fourth Amendment Rights."

The State responded that because the court already found there was reasonable suspicion to detain for the dog, the length of detention was no longer an issue; in other words, as the State asserted, it "frankly, doesn't matter." In support of this position the State cited *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), asserting that it reaffirmed

"officers can do one of two things. They can run the dog during a traffic stop, in the absence of reasonable suspicion, provided that does not extend in any measurable way the original purpose of the stop. Or, if they have reasonable suspicion that a drug offense is ongoing, which this Court already found there was, then they can detain for the dog, and really at that point the case law—the case law says, if you can detain for a drug dog, you can detain for a drug dog. The officers got the dog there as quickly as they could."

In ruling on this second suppression motion, the district court confirmed its earlier finding of additional reasonable suspicion, stating, "This Court has found there was objectively reasonable suspicion of other criminal activity at the time that the defendant revoked his consent to search. The Court still believes that finding is correct, based upon the facts that were presented."

The district court disagreed, however, with the State's argument that no temporal limitation, no duty of diligence, applied to Trooper Seiler once he developed reasonable suspicion of other criminal activity. The judge stated, "What troubles this Court is the 24-minute gap before Trooper Walker arrives with his dog, which there are Kansas cases that hold that length of detention to perform a search, even if there is reasonable suspicion is not allowed." The district court found that "nothing occurs" during these 24

minutes and concluded that Seiler "was not diligently and reasonably pursuing the purpose of the stop" while awaiting arrival of the drug dog.

The fruits of the search of the van as well as the statements made by Arrizabalaga after his arrest were suppressed. The State appealed.

*Court of Appeals Decision*

The Court of Appeals affirmed the district court's granting of the second suppression motion, agreeing that Seiler "did not act diligently and did not reasonably pursue the purpose of the stop after he gained reasonable suspicion that Arrizabalaga was involved in drug activity." *State v. Arrizabalaga*, 57 Kan. App. 2d 79, 94, 447 P.3d 391 (2019). The majority stated, "If Seiler was suspicious, he could have attempted to dispel his suspicions or tried to locate a drug-sniffing dog immediately." 57 Kan. App. 2d at 94. And the majority surmised, "If Seiler would have attempted to locate a dog the moment he had a reasonable suspicion of drug activity, then perhaps this search would not be on appeal." 57 Kan. App. 2d at 95.

The dissent viewed the officer's actions less critically, finding no fault in Seiler not summoning a drug dog the minute he first believed he might have reasonable suspicion of other crimes, and concluding that his pursuit of other means to confirm or dispel his suspicions was diligent under the circumstances. 57 Kan. App. 2d at 102 (Gardner, J., dissenting).

DISCUSSION

*Initial Traffic Stop*

The events occurring at the scene of this traffic stop are perhaps best viewed as a series of distinct encounters between motorist and officer, each with its own timeline, and each relying on its own legal justification. The first encounter began at 9:37 p.m. when Seiler pulled the suspect vehicle over on Interstate 70 near Salina. It ended 16 minutes later at 9:53 p.m. when he handed the warning ticket to Arrizabalaga.

A routine traffic stop is likened to a brief stop under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), as opposed to an arrest. *Rodriguez*, 575 U.S. at 354. It is a form of investigative detention which must be legally justified from the start by reasonable suspicion of criminal activity. *State v. Jimenez,* 308 Kan. 315, 323, 420 P.3d 464 (2018). A traffic infraction provides the reasonable suspicion required to initiate a traffic stop. *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014).

The scope of investigation during the stop is delineated by the circumstances which rendered its initiation proper. *State v. Damm,* 246 Kan. 220, 224, 787 P.2d 1185 (1990). "Beyond determining whether to issue a traffic ticket, an officer's mission includes . . . checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.

The duration of a routine traffic stop is generally limited to the time reasonably necessary to carry out its mission. *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 355.

10

As noted above, the district court found that Seiler's stop of the vehicle was supported by the observed traffic offense of following too closely (in violation of K.S.A. 8-1523), and that he "diligently pursued the mission of the traffic stop" as he questioned Arrizabalaga and prepared the warning citation. The district court's ruling on the justification for the traffic stop is not at issue in this appeal. Nor is the scope or duration of this initial 16-minute encounter.

*Brief Voluntary Encounter*

The second encounter began at 9:53 p.m. when Arrizabalaga agreed to answer additional questions and consented to a search of the van. It ended four minutes later at 9:57 p.m. when Arrizabalaga withdrew his consent to search. "Generally, courts do not consider a consensual encounter to be a seizure within the meaning of the Fourth Amendment. Consent itself makes the encounter reasonable, and the State need not establish that officers had probable cause or reasonable suspicion before initiating the encounter." *State v. Andrade-Reyes*, 309 Kan. 1048, Syl. ¶ 2, 442 P.3d 111 (2019).

In ruling on the first suppression motion the district court found that this four-minute continuing interaction was voluntary and not a seizure for Fourth Amendment purposes. This ruling is not appealed.

*Continued Detention*

When Seiler took possession of the van keys following withdrawal of consent and informed Arrizabalaga he was detaining him to await arrival of a drug dog (if one was available), the third distinct encounter between Arrizabalaga and Seiler began. This continuation of Arrizabalaga's detention and its duration are the subjects of this appeal.

11

Normally, after the traffic citation process is concluded, the officer must allow the motorist to depart the scene. That is unless the officer has reasonable and articulable suspicion of additional criminal activity, or consent. *State v. Schooler,* 308 Kan. 333, Syl. ¶ 2, 419 P.3d 1164 (2018). The district court found Arrizabalaga's continued detention at that point was supported by "objectively reasonable suspicion" of other criminal activity. The judge made this ruling in response to the first suppression motion and reiterated the ruling in connection with the second suppression motion.

This ruling is also not at issue in this appeal. As the Court of Appeals majority correctly observed, "we need not and cannot question whether reasonable suspicion existed, and in deciding the second suppression issue we must rely on the district court's finding on the first motion that reasonable suspicion did exist." *Arrizabalaga*, 57 Kan. App. 2d at 88.

*Diligently Waiting for the Drug Dog*

The district court found that Seiler detained Arrizabalaga and his passenger for an additional 24 minutes to await the drug dog, and that no further investigative activity occurred during this time. These findings of fact are central to this case and are not disputed. The judge equated the absence of further investigation to a lack of diligence on Seiler's part, and concluded that under Kansas law a 24-minute detention to await a drug dog, even with reasonable suspicion of illegal drug activity, "is not allowed." In affirming the district court's legal conclusion, the Court of Appeals majority stated:

> "Under the standard of reasonableness and diligence of law enforcement and the little precedent as for what is diligent and reasonable when detaining a person after finding reasonable suspicion of illegal activity throughout an initial traffic stop, we conclude the district court did not err when granting the motion to suppress evidence. The State's claims fail because Trooper Seiler did not diligently and reasonably pursue the purpose of the stop after finding reasonable suspicion of illegal drug activity. Seiler did not attempt to locate a dog until after the stop had been going

12

on for 24 minutes and Arrizabalaga had withdrawn his consent to search the vehicle. It took another 24 minutes for the dog to arrive and eventually perform a search. Substantial competent evidence supports the district court's finding that Seiler failed to diligently and reasonably pursue the purpose of the stop because he did nothing about his suspicion until the second 24-minute period began." 57 Kan. App. 2d at 96.

The narrowly drawn issue for this court's consideration is whether Seiler, after developing reasonable suspicion of illegal drug activity, acted diligently to verify or dispel his suspicion. Was the district court correct in concluding that the continued detention of Arrizabalaga to await the drug dog exceeded its permissible limit? The issue is presented by the State's interlocutory appeal from the district court decision to grant the second motion to suppress. The appeal is authorized by K.S.A. 2020 Supp. 22-3603, and review of the Court of Appeals decision is pursuant to K.S.A. 60-2101(b).

When a search and seizure is challenged by a motion to suppress, the burden is on the State to prove its lawfulness. K.S.A. 22-3216(2); *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). In reviewing a district court's suppression ruling, the appellate court first determines whether the district court's factual findings are supported by substantial competent evidence. It then reviews the court's legal conclusions de novo. *State v. Galloway*, 311 Kan. 238, 245, 459 P.3d 195 (2020). When the parties do not dispute the underlying material facts, the suppression question is "solely one of law." *State v. Thomas*, 291 Kan. 676, 682, 246 P.3d 678 (2011).

In reaching its legal conclusion the district court relied largely on *State v. Coleman*, 292 Kan. 813, 823, 257 P.3d 320 (2011), where this court held that a 35-minute plus roadside detention to await arrival of a parole officer for an administrative search was arbitrary and unlawful. The Court of Appeals majority likewise relied on *Coleman* in affirming the district court. *Arrizabalaga*, 57 Kan. App. 2d at 89-90.

13

In *Coleman*, the driver was stopped for speeding between Wichita, Kansas, and Hutchinson, Kansas. The car had been rented in Hutchinson, and the rental agreement had expired two days earlier. Coleman claimed to have renewed the agreement by phone. In checking Coleman's license, the officer discovered that he was on parole. He also learned that deputies with the drug enforcement unit had "specific knowledge" of Coleman moving cocaine between Wichita and Hutchinson. 292 Kan. at 815. A parole officer contacted the traffic officer and asked that Coleman be detained at the scene to be searched pursuant to Kansas Department of Corrections guidelines. The parole officer arrived somewhere between 35 minutes to an hour later. He searched Coleman and his car and found cocaine. Coleman was arrested and later charged.

This court agreed with the district court that the drug trafficking information, the expired rental agreement, and Coleman's parole status together added up to reasonable suspicion of other criminal activity "justifying a temporary detention and allowing further investigation." 292 Kan. at 821. However, because the traffic officer did not act on those suspicions and instead simply waited over 35 minutes for arrival of the parole officer, he "detained Coleman for the sole purpose of providing a parole officer with enough time to arrive and conduct a search under the Kansas Department of Corrections' rules." 292 Kan. at 822. The traffic officer had exceeded his authority and unlawfully detained the driver. This court directed that the seized evidence be suppressed, and that Coleman's conviction based on stipulated facts be reversed. *Coleman*, 292 Kan. at 823.

The problem with reliance on *Coleman* is that it bears little similarity to the case at hand. Although the investigating officer in *Coleman* had reasonable suspicion of additional criminal activity, that officer undertook no investigative steps to confirm or dispel his suspicion. Unlike Trooper Seiler, that officer did not pursue additional questioning or seek consent to search the vehicle. Nor did he call for a drug dog.

14

When the State argued that *Rodriguez* dispenses with the need for law enforcement diligence (it "frankly, doesn't matter") in cases like this where reasonable suspicion of further criminal activity is present following a traffic ticket, it mischaracterized prevailing law. The State overplayed its hand and the district court responded by rejecting the argument and concluding that diligence and reasonableness by law enforcement is required in all cases, irrespective of reasonable suspicion. We agree.

The United States Supreme Court has offered, "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). That Court reasoned, "if an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." 470 U.S. at 685.

There is no specific length or passage of time that renders a stop unlawful. Nor can there be. The United States Supreme Court has imposed no rigid time limit on *Terry* investigative stops. Rather, that Court has said, "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685. The *Sharpe* Court found a per se rule that 20-minute detentions are too long is "clearly and fundamentally at odds with our approach in this area." 470 U.S. at 686.

As the district court correctly noted here, the acceptable duration of any traffic stop is determined in each case by the totality of the circumstances. What is reasonable and diligent will vary from case to case. In *Jimenez* this court agreed that traffic stops do not lend themselves well to hard and fast time limits, emphasizing this point by quoting from *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017), as follows:

"'The "acceptable length of a routine traffic stop," however, "cannot be stated with mathematical precision." In evaluating the reasonableness of a stop, we consider "what the police in fact do," and whether the officers acted reasonably under the totality of the circumstances presented to them. Thus, an officer need not employ "the least intrusive means conceivable" in executing a stop, but he still must be reasonably diligent and must use "the least intrusive means reasonably available."' [Citations omitted.]" *Jimenez,* 308 Kan. at 331.

As noted, the district court here looked strictly at the 24 minutes starting when Arrizabalaga withdrew consent to search and ending when Officer Walker arrived with the drug dog. The panel started its clock earlier, somewhere during the minutes following inception of the traffic stop, but before Seiler called for the drug dog. The panel suggested Seiler should have called for the drug dog "the moment he had a reasonable suspicion of drug activity" but did not say when that moment was. *Arrizabalaga*, 57 Kan. App. 2d at 95. Seiler himself could not identify the precise time he formed what he believed was reasonable suspicion of other criminal activity, except that it occurred at about the time of Arrizabalaga's confusing answers about travel plans. Nevertheless, the panel surmised (speculated) that if Seiler had summoned the drug dog earlier, "then perhaps this search would not be on appeal." 57 Kan. App. 2d at 95.

We believe the district court focused on the correct segment of time, the 24 minutes between withdrawal of consent and arrival of the drug dog. It is the segment of time addressed by the parties in this appeal and addressed by the district court in its ruling on the second suppression motion. We determine however that the district court erred in its legal conclusion that Trooper Seiler unlawfully detained Arrizabalaga during these 24 minutes by failing to undertake additional investigative activities.

While Seiler perhaps could have called for the drug dog at some point prior to Arrizabalaga withdrawing consent to search, what sense does it make to compel him to do so under the circumstances? Arrizabalaga had agreed to answer Seiler's additional

16

questions. And he initially consented to a search of the van. These were logical means by which Seiler could attempt to confirm or dispel his reasonable suspicion of drug activity. And they were the least intrusive means available to Seiler at the time.

As the dissent noted, "Only when Arrizabalaga withdrew the consent for the trooper to search the van did the need to call a drug dog arise." 57 Kan. App. 2d at 103 (Gardner, J., dissenting). And as the United States Supreme Court has emphasized, judicial imposition of rigid time requirements on law enforcement can "undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." *United States v. Place*, 462 U.S. 696, 709 n.10, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). For all Seiler knew, his suspicion of illegal drug activity might be resolved by Arrizabalaga's answer to his next question. Or by the consent to search the van and its cargo that he initially sought and obtained. So why should the law require him to prematurely call for a drug dog?

Not to mention that the presence of a drug dog has the potential to be a very intrusive process, one in which the occupants are removed from their car, often handcuffed for safety reasons, and required to stand by as a dog sniffs, scratches, and walks around their vehicle. Arranging for a drug dog takes time. Most of this traffic stop unfolded after 10 p.m. The stop occurred at a rural location (on the side of an interstate highway outside of Salina, Kansas). And a drug dog was not immediately available. Furthermore, the services of a drug dog require not only the dog's presence but also the presence of the dog's handler. This court would be remiss to impose a rule of law which compels the unnecessary expenditure of law enforcement resources.

While no further investigative activity occurred during the 24-minute wait for the drug dog, what else was Seiler to do that he had not already done? If he asks further questions of Arrizabalaga, any answers obtained may later be viewed as coerced. If he again seeks and obtains permission to search the van, this search may later be deemed

17

non-consensual. Seiler had already run a driver's license check, a vehicle registration check, a criminal records check, etc. He had completed the tasks this court has listed as the basic allowable components of a routine traffic investigation. See *Jimenez*, 308 Kan. 315, Syl. ¶ 3. To have done more out of frustration or impatience would potentially have led to later judicial scrutiny.

This court's prior cases provide no definitive answer here because there is no set length or passage of time at which a roadside detention based on reasonable suspicion becomes an unlawful seizure under the Fourth Amendment. *Coleman* as we said does not inform our answer. Several of this court's recent roadside detention cases, namely *Jimenez* and *Schooler* (both decided June 22, 2018) are instructive on certain points and have factual similarities, but neither case focuses on the specific time frame or question of diligence involved here.

The dissent discusses a variety of 10th Circuit cases where the officer waited "until a traffic stop is concluded to call for a drug dog based on reasonable suspicion formed during the traffic stop." *Arrizabalaga*, 57 Kan. App. 2d at 100 (Gardner, J., dissenting). In each case a greater than 24-minute delay to await the drug dog was deemed reasonable. 57 Kan. App. 2d at 100-01 (Gardner, J., dissenting). These cases cut against requiring officers to call for a drug dog as soon as he or she develops reasonable suspicion of illegal drug activity, as the panel majority would require. Nor do they support a per se rule that a 24-minute detention based on reasonable suspicion to await a drug dog "is not allowed," as the district court held.

In the final analysis, the question in cases like this is always one of reasonableness and diligence. We conclude, as did the Court of Appeals dissenting judge, that Seiler detained Arrizabalaga and his passenger "for no longer than was necessary to get a drug dog to the scene to quickly confirm or dispel his reasonable suspicions." 57 Kan. App. 2d at 104 (Gardner, J., dissenting). Under the circumstances existing that night outside of

18

Salina, Kansas, waiting 24 minutes for a fellow officer to arrive with a drug dog was reasonable and diligent. The prudent course of action was the one taken. Seiler first sought cooperation through additional questions and consent to search. He called for a drug dog only after less intrusive investigative methods failed.

We agree with the dissent that the panel majority engaged in post hoc second guessing of police conduct, imagining what other different investigative approaches might have accomplished. 57 Kan. App. 2d at 108 (Gardner, J., dissenting) (citing *Sharpe,* 470 U.S. at 686-87). We choose not to go there.

CONCLUSION

We reverse the ruling of the district court that Trooper Seiler unlawfully detained Sergio Arrizabalaga at the scene of the traffic stop in this case. We reverse the decision of the Court of Appeals affirming that ruling. We remand the case to the Saline County District Court for further proceedings consistent with this opinion.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,209 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.