NOT DESIGNATED FOR PUBLICATION

No. 126,449

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

LOUIS MCCARTER,
*Appellee*.


MEMORANDUM OPINION

Appeal from Pottawatomie District Court; JEFFREY R. ELDER, judge. Submitted without oral argument. Opinion filed November 1, 2024. Reversed and remanded with directions.

*Natalie Chalmers*, assistant solicitor general, *Kris W. Kobach*, attorney general, for appellant.

No appearance by appellee.


Before MALONE, P.J., HURST and COBLE, JJ.


HURST, J.: The State appeals the district court's decision to exclude essentially all the evidence necessary for its prosecution of Louis McCarter. After a traffic stop in which the officer prolonged McCarter's detention to have a drug dog perform an air sniff around McCarter's van, the State charged McCarter with unlawful possession of methamphetamine and marijuana and transportation of open containers. McCarter sought to suppress the evidence obtained from the search, claiming the officer unlawfully "extended the traffic stop beyond what was reasonably necessary to complete the mission of addressing the traffic infraction." The district court determined McCarter's detention violated his Fourth Amendment right to be free from unreasonable searches and seizures.

1

Because the district court based its decision on the officer's subjective intent to avoid concluding the traffic stop rather than whether McCarter's seizure was objectively unreasonable under the circumstances, this court reverses the suppression and remands for proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

Almost two months after a traffic stop in April 2022, the State charged McCarter with unlawful possession of methamphetamine, a felony; unlawful possession of marijuana, a misdemeanor; and transport of an open container, a misdemeanor. McCarter later moved to suppress the evidence obtained from the search of his vehicle during that stop.

At the hearing on McCarter's motion to suppress, a Wamego Police Department Officer confirmed that on April 27, 2022, he received a call from dispatch about a report of a white van driving recklessly. The officer identified the van and followed it to a local business parking lot where the driver of the van, McCarter, parked. The officer did not observe any traffic violation prior to McCarter parking the van but confirmed that when the officer drove by the parked van he saw it had a cracked windshield. Law enforcement body camera and vehicle footage of the encounter were admitted into evidence.

After the responding officer pulled into the parking area behind McCarter's van, activated his patrol car's lights, and began walking toward the van, McCarter got out of his van and walked toward the officer. Just a minute later, the officer's body camera footage shows McCarter standing in the space between his open driver's side door looking for something in his van. McCarter then turned toward the officer with his vehicle registration from the van and told the officer that he had just come from the eye doctor and could not see out of one of his eyes. The officer explained he wanted to talk to McCarter because someone reported the van swerving on the road. McCarter explained

2

he was hauling heavy ceramic tile—which caused the van to swerve—and then opened the back of the van to show the tile. At the suppression hearing, the officer confirmed that after this explanation, he no longer continued to investigate the report of erratic driving but confirmed he was still considering issuing a citation for a cracked windshield and, later, lack of insurance.

The officer asked McCarter for his proof of insurance, and McCarter began looking through the documents in his hand. The officer then radioed for another officer to meet him. In response to questioning, McCarter explained that he pulled over to make a phone call. The officer stated several times that McCarter jumped out of the van and was running or stomping toward him—which was not evident from the video. McCarter expressed confusion about the accusation and eventually said he "didn't mean to jump out and come at you or anything." McCarter confirmed his license was suspended but explained he was allowed to drive for work. At the suppression hearing, the officer explained that during the initial minutes of his interaction with McCarter he called for backup due to the "speedy fashion" in which McCarter got out of the van and approached him.

McCarter provided the officer proof of insurance which had recently expired, so the officer asked if he had newer proof of insurance. McCarter said it was probably at his house, and the officer offered to let him make a call to have someone bring the new insurance card. At the suppression hearing, the officer confirmed it was common for him to give people leeway to have family members come to the location of a stop to provide proof of insurance, and he used his discretion to determine how long to wait. The officer also confirmed that if a person ticketed for operating a vehicle without insurance provided valid proof of insurance within 10 days of the citation date, the ticket would be dismissed without conviction.

McCarter then walked to the front passenger side of his van, and the officer can be heard in the video providing McCarter's driver's license number to someone on the radio and asking for someone to "come over here." The officer told McCarter to keep out of the vehicle and said that he noticed a baton on the floorboard and asked if McCarter had any other weapons on him. McCarter responded, "No. Please don't mess with me." McCarter can be seen going back toward his van and reaching for some things that he had put on the ground, and the officer told McCarter to quit going to the van; McCarter turned around, put his hands up and again said, "Please don't mess with me." The officer told him that if he goes back toward the van again, McCarter would get hurt. McCarter agreed. The officer then told McCarter that he could not sit down and patted him down for weapons. After the officer checked McCarter for weapons, he brought McCarter toward the back of the van and McCarter asked why he was being detained. The officer explained that McCarter was detained to find his proof of insurance and make a call to get an unexpired one if needed.

At 5:12 pm, about six minutes after the initial stop, the officer requested a canine unit to respond. When McCarter told the officer he was anxious, the officer said it is "a simple traffic stop" and not to make it worse for himself. At 5:16 pm, a sergeant arrived on the scene and the investigating officer told the sergeant that McCarter had "jumped out of the van and like started charging back towards my car." The officer also told the sergeant that he had seen an expandable baton on the floor and an ashtray on the passenger seat with a torch. The officer asked the sergeant to stay with McCarter while he went to look through the van's passenger-side window. At the suppression hearing, the officer confirmed he could have safely started writing McCarter a ticket once the sergeant arrived on scene.

At 5:19 pm, about 12 minutes after the interaction began, another officer arrived on scene and the original officer reported he had not handled the citation yet and was waiting for "Ryan," the canine officer, to arrive to run the dog around the van while he

4

wrote the tickets. McCarter then notified the officer that someone was bringing his insurance verification. At 5:22 pm, the officer told McCarter he would get started on the citation for the broken windshield and that if McCarter got it fixed before the hearing, it would probably be dismissed. Before writing the citation, the officer told McCarter he would wait a few more minutes for the insurance to arrive so that he would not have to void that ticket later. In the body camera footage, McCarter then says, "I don't care. Whatever it's gonna take to get me out of here." At the suppression hearing, the officer confirmed he did not believe McCarter had requested or demanded the officer write the ticket for lack of insurance rather than continuing to wait for updated insurance information.

At 5:23 pm, McCarter's mother arrived and asked why McCarter was pulled over. The sergeant on scene explained McCarter was just being detained for the traffic stop. McCarter's mother spoke to the officer for about a minute before she said she would be "right back" and drove away to presumably get insurance verification from her house.

At about 5:29 pm, shortly after McCarter's mother left, the canine officer arrived on scene. At 5:32 pm, the investigating officer got into his patrol vehicle and appeared to begin writing the citation when the officer's body camera footage ended. The officer was outside the car when the body camera footage restarted and the officer told McCarter the dog would identify if there were any drugs in his van and requested McCarter's honesty. At the motion to suppress hearing, the investigating officer confirmed the canine officer informed him the dog alerted to potential drugs in the vehicle, and he then searched the van. He also confirmed that prior to the search neither McCarter nor anyone else had provided the updated proof of valid insurance for the van.

The officers then searched the van discovering the evidence leading to McCarter's charges which included open alcohol containers, a small vial with remnants of white powder, and a small black case with what appeared to be marijuana residue. The officers

collected items for testing and, after the search, let McCarter leave with just a warning for the broken windshield. The officer did not issue McCarter any other tickets at that time. McCarter was allowed to leave with his mother but was later arrested on June 15, 2022.

On April 4, 2023, McCarter moved to suppress the evidence obtained from the search of his van, arguing the evidence was derived from an illegal detention. McCarter argued the officer unreasonably extended the traffic stop for a cracked windshield and outdated insurance to wait for the drug dog to arrive on scene. The State responded that the officer waited for McCarter's mother to bring updated proof of insurance to see if he needed to write a citation for lack of insurance in addition to the cracked windshield. The State claims the officer never abandoned the purpose of obtaining McCarter's proof of insurance while the drug dog sniffed around.

The district court granted McCarter's motion to suppress because the investigating officer's true objective in conducting the traffic stop "was to get a drug dog there to run around the car and the officer was not acting within the mission of the original traffic stop." The State appeals.

DISCUSSION

The State brings this interlocutory appeal pursuant to K.S.A. 22-3603, arguing the district court inappropriately suppressed the van search and resulting evidence. The State first contends it may bring this action because the excluded evidence substantially impairs the ability to prosecute its case against McCarter. See *State v. Mitchell*, 285 Kan. 1070, 1080, 179 P.3d 394 (2008) ("If the exclusion of evidence does not substantially impair the State's ability to prosecute the case, the State cannot raise the issue as an interlocutory appeal."). The State's charges against McCarter are substantially impaired without any evidence of the van search or the remnants of methamphetamine, marijuana,

6

and open containers found therein. Therefore, this court has jurisdiction to hear this interlocutory appeal.

The State argues the district court applied the wrong legal standard when it determined the search violated McCarter's constitutional right against unreasonable searches and seizures. According to the State, the district court erroneously relied on the officer's subjective intent to prolong the traffic stop to allow time for a drug dog to arrive and perform a sniff around the van. Instead, the State argues the district court must evaluate the constitutionality of the search using an objective standard—regardless of the officer's ulterior or surreptitious motives. As a preliminary matter, this court notes McCarter did not file an appellee brief and thus did not present arguments on appeal.

Appellate courts review the district court's suppression order using a two-step process, first reviewing the facts and then applying the appropriate legal standard. At the first step, this court "reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence." *State v. Cash*, 313 Kan. 121, 125-26, 483 P.3d 1047 (2021). After determining whether the court's factual findings are supported, which is not at issue in this instance, this court reviews the ultimate legal conclusion de novo. See, e.g., 313 Kan. at 125-126. Appellate courts exercise unlimited review over the district court's legal conclusion of whether to suppress evidence. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). The burden is on the State to establish the lawfulness of the search and seizure. 307 Kan. at 827.

There are generally four types of encounters between individuals and police: (1) voluntary or consensual encounters, (2) investigatory detentions, (3) public safety stops, and (4) arrests. *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019). At the suppression hearing, the officer stated he initially intended to conduct a public safety stop due to reports of McCarter's reckless driving, but he also testified he saw McCarter had a cracked windshield as he pulled near the van and activated his emergency lights. A valid

7

public safety stop "requires an officer to believe such a stop is necessary to protect the individual or the public based on the specific and articulable facts of the particular situation." *State v. McDonald*, 318 Kan. 486, 489, 544 P.3d 156 (2024). Once the officer identified McCarter's cracked windshield and activated his lights as a result, what might have initially been a planned public safety encounter turned into an investigatory stop. See *State v. Ellis*, 311 Kan. 925, Syl. ¶ 5, 469 P.3d 65 (2020) ("The nature of a police-citizen encounter can change, and what may begin as a consensual encounter can transform into an investigative detention if the police conduct changes."); *Nickelson v. Kansas Dept. of Revenue*, 33 Kan. App. 2d 359, 367, 102 P.3d 490 (2004) (noting a change in the purpose of the detention).

The district court found that although the officer intended to perform a public safety stop, the officer's concerns were almost immediately alleviated, and the traffic stop and resulting investigation were then "based on the crack in Defendant's windshield." However, the district court also explained at the suppression hearing that there was no evidence the investigating officer had "evidence that [the windshield crack] did substantially impair [McCarter's] vision," which would be needed to justify a request for McCarter's insurance. Ultimately, it appears the district court did not invalidate the initial stop but found the investigating officer's subjective intent to prolong McCarter's detention to allow time for the drug dog to arrive meant "the officer was not acting within the mission of the original traffic stop." Thus, this panel assumes for this review—without deciding—that the officer possessed the reasonable suspicion necessary to stop and detain McCarter for driving a vehicle with a damaged front windshield that "substantially obstructs the driver's clear view of the highway or any intersecting highway." K.S.A. 8-1741(b); see *U.S. v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (requiring reasonable articulable suspicion that the windshield crack substantially obstructed the driver's view to justify traffic stop on that basis).

8

Although this court presumes McCarter's initial seizure for the traffic stop was lawful, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). An initially legal stop can turn into an investigatory detention which is "constitutionally permissible if an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime." *Hanke*, 307 Kan. at 828. To stop a driver for a broken windshield under K.S.A. 8-1741(b), as was done here, the officer must have a reasonable suspicion based on "'a particularized and objective basis'" to believe the windshield crack substantially obstructs the driver's view. *Callarman*, 273 F.3d at 1287. However, it is ultimately irrelevant whether upon ultimate investigation the crack is actually large enough to constitute a violation of the law—but it does matter that the officer had a particularized and objective basis for believing it violated the law. 273 F.3d at 1287. The court's journal entry reflects a lack of information regarding the officer's particularized and objective basis.

An investigatory detention "'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *State v. Doelz*, 309 Kan. 133, 139, 432 P.3d 669 (2019). When, as here, the stop is to address a traffic violation, "[a]uthority for the seizure ends when tasks tied to the infraction are—or reasonably should have been—completed." *Rodriguez v. U.S.*, 575 U.S. 348, 348-49, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). Seizure to issue a traffic ticket or warning can become unlawful if "prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407. As part of a traffic stop, officers may inspect the driver's license, verify registration and insurance, determine whether the driver is subject to outstanding warrants, and ask questions related to the traffic infraction providing a legal basis for the stop. See *State v. Jimenez*, 308 Kan. 315, 331, 420 P.3d 464 (2018). Checking the person's license, registration, and insurance "serve[s] the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*,

9

575 U.S. at 349. The question then becomes whether and when the officer has—or reasonably should have—completed the mission.

Here, the officer stated he stopped and detained McCarter to investigate the broken windshield and requested McCarter's license, registration, and insurance as part of that investigatory stop. Such a request is permissible. Because McCarter's proof of insurance had recently expired, the officer allowed McCarter to contact his mother to bring the updated insurance. That is also permissible. Then, when it became apparent McCarter's updated proof of insurance was not readily available—rather than issuing McCarter a ticket for outdated proof of insurance—the officer purposely continued to wait to allow time for the drug dog to arrive. If the "stop is extended in time beyond the period that the officers are completing tasks related to the traffic infractions, the officers must either obtain consent from the individuals detained or identify reasonable suspicion of criminal activity to support the extension of the stop." See *Jimenez*, 308 Kan. at 331. So, the district court was charged with determining whether the stop extended beyond the time for the officer to complete the tasks for the traffic stop. *State v. Lutz*, 312 Kan. 358, 366, 474 P.3d 1258 (2020) ("A dog sniff of the exterior of an automobile during an otherwise lawful traffic stop does not implicate legitimate privacy interests and is not a search subject to the Fourth Amendment.").

While "[a] seizure for a traffic violation justifies a police investigation of that violation," officers cannot extend an investigatory traffic stop indefinitely. *Rodriguez*, 575 U.S. at 354. The stop duration is determined by the mission of the stop and should "last no longer than is necessary to effectuate that purpose." 575 U.S. at 354. The lawful seizure of a traffic stop cannot be "measurably extend[ed]" by unrelated police inquiries or activities. 575 U.S. at 354. Part of determining whether a stop extends beyond the time necessary to complete the mission of investigating the traffic violation and conducting the ordinary inquiries incident to such a traffic stop is evaluating whether the length of the stop was reasonable under the circumstances. *U.S. v. Sharpe*, 470 U.S. 675, 686, 105 S.

10

Ct. 1568, 84 L. Ed. 2d 605 (1985); see also *Rodriguez*, 575 U.S. at 354. There is no specific length of time that renders a stop unreasonable. *State v. Arrizabalaga*, 313 Kan. 323, 334, 485 P.3d 634 (2021). Rather, "the acceptable duration of any traffic stop is determined in each case by the totality of the circumstances." 313 Kan. at 334. Although an officer may conduct ordinary and typical tasks such as checking McCarter's driver's license and proof of insurance, the time to complete those tasks must be reasonable under the circumstances of the stop.

Here, the district court did not evaluate the reasonableness of the length of the stop under the circumstances of the reason for the stop—McCarter's broken windshield—but instead relied on the officer's obvious, subjective intent to prolong the stop. However, the constitutional reasonableness of the length of a traffic stop investigation does not turn on the officer's subjective intent to secretly investigate unrelated crimes for which the officer does not have reasonable suspicion. See *Whren v. U.S.*, 517 U.S. 806, 812-13, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). The district court therefore improperly focused on the officer's subjective motivation rather than objectively assessing whether the mission of the traffic stop was "or reasonably should have" been completed. *Rodriguez* 575 U.S. at 348-49; see *Whren,* 517 U.S. at 812-13 (outside the context of inventory searches or administrative inspection, an officer's subjective motive does not invalidate objectively justifiable behavior under the Fourth Amendment).

Although its assessment was detailed and thoroughly considered, the district court applied the wrong legal standard. The temptation to judge the reasonableness of a stop by the officer's clear intention and motivation is undeniable—but that is not the appropriate standard. The district court is charged with determining whether the length of the stop was reasonable based on the circumstances of the stop, which would include the reason for the stop and performance of the ordinary inquiries incident to such a stop. Although obtaining proof of insurance may be a typical, ordinary inquiry during a traffic violation investigation, there are limits to the reasonable time taken for such an inquiry under the

11

circumstances of the traffic stop investigation. The district court must determine the reasonableness of the time taken for this investigation under the circumstances without regard to the officer's subjective intent to investigate a separate crime for which the officer lacked reasonable suspicion. *See Jimenez*, 308 Kan. at 331.

CONCLUSION

The district court applied the wrong legal standard in granting McCarter's motion to suppress. In applying the correct legal standard, the district court may need additional evidence about the traffic stop and reasonableness of the associated length of McCarter's detention under the circumstances. See *State v. Daino*, 312 Kan. 390, 405-06, 475 P.3d 354 (2020) (district court applied the incorrect legal standard in suppressing results of a search, reversed and remanded for further proceedings). The district court's suppression order is reversed, and the case is remanded for further proceedings the district court deems necessary to allow it to apply the correct legal standard.

Reversed and remanded with directions.